# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

    vs.

JOHN LEE RALSTON,

                    Defendant.

Case No. 21-cr-76-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## TABLE OF CONTENTS

Page

I.     *INTRODUCTION*................................................................2

II.    *FINDINGS OF FACT*..........................................................3

      A.    *Whether the First Warrant Contained a Substantial Basis for Concluding that Probable Cause Existed to Issue the Warrant* ..........................11

            1.    *The Parties' Arguments* ...................................13

            2.    *Analysis* ........................................................16

      B.    *The* Leon *Good Faith Exception* ................................26

      C.    *Fruits of the Poisonous Tree* ...................................32

            1.    *Whether Evidence Seized Pursuant to the Second Warrant Must be Suppressed as Fruit of the Poisonous Tree*..........................33

                    a.    *The Warrant* .....................................33

                    b.    *Analysis* ...........................................34

1

  **2.** *Whether Evidence Seized Pursuant to the Third Warrant Must be Suppressed as Fruit of the Poisonous Tree*............................**36**

    *a.* *The Warrant* ......................................................**36**

    *b.* *Analysis* ............................................................**38**

 **D.** **Recommendation**.....................................................**39**

**III.** **CONCLUSION** ...............................................................**40**

## I. INTRODUCTION

On December 14, 2021, the Grand Jury charged Defendant John Lee Ralston with one count of Possession of Firearms by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(1), 922(g)(3), 922(g)(9), and 924(a)(2). (Doc. 2.)

The matters before the Court are Defendant's Motion to Suppress and Supplemental Motion to Suppress. (Docs. 21 and 28.) The Government timely filed a response. (Doc. 27.) Defendant timely filed a reply. (Doc. 29.) The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Thursday, March 3, 2022. (Doc. 30.)

At the hearing, the following Government exhibits were admitted without objection:

1. An application for a search warrant with supporting affidavit and attachments, a search warrant, and a warrant return ("the first search warrant"). (Gov. Ex. 1);

2. An application for a search warrant with supporting affidavit and attachments, a search warrant, and a warrant return ("the second search warrant"). (Gov. Ex. 2); and

2

3. An application for a search warrant with supporting affidavit and attachments, a search warrant, and a warrant return ("the third search warrant"). (Gov. Ex. 3).

Defendant filed an Inventory of Items to be Suppressed and a Supplemental Inventory of Evidence to be Suppressed. (Docs. 21-1 and 28-1.) Defendant's Exhibit A was admitted without objection: Exhibit containing the first, second, and third search warrants and supporting evidence. (Def. Ex. A).

The Government called one witness: Sergeant Investigator Tim Smith of the Jones County, Iowa Sheriff's Department ("Deputy Smith"). For the following reasons, I respectfully recommend that the District Court **grant** Defendant's Motions to Suppress.

## II. FINDINGS OF FACT

This case involves three search warrants issued and executed at two different times on January 15, 2021. The dispute before the Court principally arises out of the first search of Defendant's residence located on real property in rural Jones County, Iowa ("the property.") The property is bisected by Bear Creek Road with structures on either side. Prior to the search, investigators had identified Colton Varty as a suspect in multiple burglaries in the area and suspected he might have secreted items he had stolen on the property. The property contained two residences: a mobile home on the north side of the road and a single-family residence on the south side of the road. At the time of the search, Mr. Varty appears to have been residing in (or at least "frequenting") the mobile home while Defendant was known to be residing in the single-family home. The problem presented is whether the affidavit supported a search of Defendant's residence. To address this issue, I find it helpful to catalog the nature of evidence Deputy Smith marshaled in support of his first warrant application:

1. The affidavit is replete with information regarding Mr. Varty's involvement in burglaries in Jones County, Iowa from on or about December 16, 2020 to

3

December 25, 2020. (Gov. Ex. 1 at 3-5.)  There seems to be no dispute that these burglaries created probable cause to search the trailer where law enforcement believed he resided.  However, law enforcement had no knowledge that Defendant was in any way involved in these burglaries and extensive details relating to each of them do not need to be recited here.

2. Mr. Varty was suspected of breaking into unoccupied buildings and construction trailers and stealing various items, mostly power tools, and related equipment.  (*Id.* at 3-5, 36, 44.)  The warrant application did not contain evidence supporting Defendant's involvement in these break-ins and/or thefts. Relevant to the issues at bar, the affidavit discloses law enforcement's suspicion that Defendant could be involved in possession of or "fencing" stolen property from the thefts.

3. Witnesses and law enforcement reported seeing, variously, a "smaller SUV, possibly silver in color, comparable to a Ford Escape," "a Jeep Liberty (possibly green in color)," Mr. Varty's vehicle, and Mr. Varty in and around the locations of the burglaries.  (*Id.* at 3-4.)  Some of these sightings were in the dark early morning hours, which are the hours when law enforcement believes the burglaries/thefts also occurred.  (*Id.*)  Defendant was not alleged to have been seen in these vehicles or at these sites.

4. Mr. Varty is the registered owner of a 2003 blue Jeep Liberty.  (*Id.* at 4.)[1] [2]

---

[1] A witness who had described the vehicle at the scene of one of the burglaries as "a smaller SUV, possibly silver in color," confirmed that Defendant's Jeep was the vehicle he saw at the scene and stated that the original misidentification was likely due to "road dust and/or time of day," which was about 4:13 a.m.  (Gov. Ex. 1 at 3.)

[2] Government's Exhibit 1 and the first part of Defendant's Exhibit A are the same affidavit and accompanying exhibits Deputy Smith presented to Magistrate Kristin L. Denniger in support of the first search warrant application. The Government's exhibits are generally more legible. Deputy Smith testified that for budget purposes, at least one photograph in evidence is a black

4

5. At 4:20 a.m. on December 26, 2020, Mr. Varty was involved in a traffic stop in the area where the burglaries occurred. (*Id.* at 5.) The officer conducting the stop noticed that Mr. Varty was dressed in all camouflage clothing and was "extremely nervous." (*Id.*) The officer observed a black duffle bag in the back of the Jeep that appeared full with the zipper partly opened. Inside the duffle, he saw what he believed was a DeWalt tool. (*Id.*) The officer also noticed three Dewalt products on the back driver's seat, including a DeWalt angle grinder with an attached grinding wheel. (*Id.*) Mr. Varty told the officer he was not gainfully employed, but that the tools belonged to "his boss," whose telephone number he did not know. (*Id.*)

6. Deputy Smith was aware that battery-powered tools like the DeWalt tools possessed by Mr. Varty on December 26 are utilized as burglary tools[3] and that grinders are commonly utilized to gain access to structures and vehicles to commit thefts within. (*Id.*) Deputy Smith also knew a grinder was used to access trailers during a construction site burglary on December 25. (*Id.* at 4-5.) Several tools were taken during this burglary. (*Id.* at 44.)

7. In late December 2020, a confidential source ("CS") stated that Mr. Varty offered to sell him tools and indicated that the tools were stolen ("hot"). (*Id.* at 5.) The CS arranged a controlled purchase between Mr. Varty and Chief Deputy Eckhardt. Mr. Varty arrived in his Jeep. Chief Deputy Eckhardt asked where the "job" was, meaning where the theft had occurred, and Mr. Varty said it was "close to home" and the name of the person was "Industry Builder," indicating that was the name on the side of the trailers. (*Id.*) Chief Deputy

---

and white copy of what was a color map presented to Magistrate Denniger. Some of the images in the exhibits are not wholly legible due to the quality of the copies.

[3] At the hearing, Deputy Smith acknowledged that these items can accurately be characterized as construction tools that may be used for burglaries.

Eckhardt purchased 17 tools from Mr. Varty for $150. (*Id.*; Smith Hr'g Test.)[4] The owner of Integrity Builders verified that several of the tools recovered in the undercover purchase were stolen from his company trailers during the December 25 construction site burglary. (*Id.*) Deputy Smith believed that Mr. Varty was still in possession of more tools from this burglary. (*Id.*)

8. On January 12, 2021, Chief Deputy Eckhardt received a photo from the CS depicting tools that Mr. Varty attempted to sell to the CS. (*Id.* at 6.) In the Facebook Messenger photo, the tools are "clearly laid out on a carpeted floor, believed to be a residence. There is also a stain on the floor which may be later identified executing [a] search warrant which would be relevant for criminal prosecution." (*Id.*) In the photo, the person displaying the goods (presumably Mr. Varty) is wearing brown suede shoes similar to moccasins that have "unique" stitching. (*Id.*)

9. The affidavit in support of the first search warrant also stated that the sheriff's office knew cutting tools had been used to gain access in some of the burglaries and that the Iowa crime lab can match tool marks from suspected burglary tools used to cut locks at a burglary site and listed various cutting tools, including grinders. (*Id.* at 7.)

10. Deputy Smith knew the following facts about the property and Defendant's and Mr. Varty's relationship to it:

> I aware [sic] the thefts and burglaries mentioned in this affidavit have all occurred within several miles of John Ralston's residence where we

---

[4] Citations to Deputy Smith's hearing testimony are to the Court Reporter's rough draft of the transcript of the March 3, 2022 suppression hearing that was provided as a courtesy to the Court. An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

believe Varty and Ralston are residing. We are aware based on sources utilized in this affidavit Varty has been utilizing his vehicles to likely scope out other properties to perpetrate his crimes. It is also possible, given the fact that several of the known locations are uninhabited, Varty may have already utilized said vehicle to commit crimes at other locations unknown to Law Enforcement. We are aware, Varty has been observed in the area of other properties which have residents known to be involved in stolen property. I am aware that often, suspects in these types of crime, take stolen property to multiple locations to "fence" and help avoid detection by Law Enforcement. The "fence" may be utilized to conceal stolen property or the "fence" may purchase the stolen property for a reduced price. They may also trade for other stolen property/narcotics. Often burglars will utilize storage sheds or other private property to conceal the stolen property.

Over the course of this investigation, Varty's vehicle, described above has been observed on multiple occasions at John Ralston's property located at XXX1 Bear Creek Road. The vehicle has been primarily parked on the northside of the property nearest the mobile home on the property. In speaking with a local resident of the area, [A.F.], he advised he has personally observed Varty on or about John Ralston's property on multiple occasions in the last several weeks. Your affiant has personally observed Varty's vehicle at Ralston's. I have also noticed there has been smoke coming from the flue at the mobile home.

On the 5th of January, 2021, Chief Deputy Eckhardt received information from his confidential source, Varty was residing at John Ralston's property.

. . .

On the 14th of January, 2021, Investigator Austin Sorgenfrey and I drove by John Ralston's property. We again observed Colton Varty's Jeep Liberty parked on the north side of the [sic] to the north of the mobile home. The mobile home had smoke coming from the wood burning furnace indicating likely someone is residing inside. I observed Colton Varty on the south side of the property (south side of Bear Creek Road) walking towards a vehicle parked near the front of the property. The vehicle appeared to be a lighter colored Chevy Equinox (we believe this is the same vehicle Varty was arrested in several weeks earlier. During his arrest, Varty possessed a sawed-off shotgun and suspected methamphetamine[)]. When we made a second pass on the roadway, this vehicle was no longer present. On this

7

same day, we observed a blue side-by-side UTV which we believed is stolen from a burglary in Cedar County. This vehicle is discussed further in a search warrant application by Deputy Sorgenfrey.

In my 8 years working as a Deputy in Jones County, I am aware John Ralston resides at XXX1 Bear Creek Road. His mother used to live on the same property. We recently received information, she has been moved into a care facility. Ralston also recently paroled from prison to this address in November of 2020. Ralston has multiple convictions for property crimes related to theft/burglary. Ralston also had multiple weapons violations. Both Ralston and Varty are known drug users. We have received information from residents there has been a lot of traffic from the property at all hours of the night. Last night, our Deputies were in the area of this property and observed a side-by-side with an attached light bar, driving on both sides of the property. Until recent [sic], this UTV was not observed on the property. We believe this UTV, after our investigation today, is that stolen from Cedar County. We know from our investigation, Colton Varty and John Ralston have no gainful employment.

In my training and experience, to include multiple investigations of this nature, I am aware these criminals will often commit burglaries/thefts centered around their place of residence. We suspect and have probable cause to believe, Varty has committed multiple crimes of [this] nature in proximity to Ralston's residence. We just received information of a recent burglary that was reported yesterday. This property is 2.55 miles (as a crow flies) from the Ralston residence. Various tools were stolen at this property. Ralston's residence is also situated on the edge of Jones and Jackson County. This is a very rural area. Ralston's property is ideal to reside and or utilize as a fence to conceal one's person as well as stolen property. Being on the fringes of two counties, this area does no [sic] get heavy patrol from L/E.[5] It is also situated in a manner which does not allow for much physical surveillance. The property and associated curtilage has multiple outbuildings, vehicles, timber, and residences, all of which could be utilize [sic] to hide and prevent L/E from locating property to which the possession is illegal. I am aware in executing search warrants of this nature, we often locate stolen property concealed in multiple areas and buildings on a property. This again, might deter L/E from . . . locating all stolen or illegal

---

[5] From the context, it appears that "L/E" is an abbreviation for "law enforcement."

property if they were to gain access to the property. I am aware burglars will generally conceal stolen tools inside of structures. One, this keeps their valuable property out of the elements but can also conceal its location from aerial surveillance using a drone or plane.

.   .   .

I know by speaking to residents situated near the Ralston residence about increased traffic to and from the residence. This short-term frequent traffic is consistent with criminal activity. I know from my experience burglaries are commonly also involved in the distribution of illegal drugs. Stealing property is a means for easy money to purchase drugs or trade for drugs.

(*Id.* at 5-7.) Deputy Smith testified that it was his belief that Mr. Varty was "frequenting or living. . . on the north side" of the property and that he had no knowledge that Defendant and Mr. Varty were living together. (Smith Hr'g Test.) The property is "just a little under 10 acres . . . pretty much split in half by Bear Creek Road. So there's roughly five acres on the north side of Bear Creek Road and five acres on the south side." (*Id.*)

Deputy Smith also testified that Defendant's property has been known to be a place to fence stolen property "over the years." (*Id.*) Deputy Smith's definition of a "fence" is "a place that property gets dropped off to further conceal, et cetera." (*Id.*) Deputy Smith also said that fences may sell or "hold onto property for an inordinate amount of time" because statutes of limitations can expire, people forget about things, or investigations move on. (*Id.*)

Deputy Smith presented his warrant application to state Magistrate Kristin Denniger on January 14, 2021. In addition to the four corners of the warrant, the judge also relied on Deputy Smith's sworn testimony provided at the time he presented the warrant application. (Gov. Ex. 1 at 70.) Under oath, Deputy Smith told Magistrate Denniger where the structures were located on the property. (Smith Hr'g Test. at 73-

9

76.)  Based on the warrant application and the testimony, the judge granted the warrant. (Gov. Ex. 1 at 71-73.)  The warrant was executed on January 15, 2021.  (*Id.* at 74-88.)

The warrant authorized law enforcement to search Defendant's residence on the south side of the property, the trailer home on the north side of the property, outbuildings, Mr. Varty's 2003 Jeep Liberty, Defendant, and Mr. Varty.  (*Id.* at 1.)  Items to be seized were

- "[I]tems commonly used or [used to] assist in thefts or distribution of stolen property," including cellular phones;
- Indicia of occupancy;
- Tools burglars could use to gain access to locked structures or storage containers;
- Known stolen property;
- Carpet to verify a stain pattern;
- Footware believed to have been worn during thefts;
- Brown suede shoes similar to moccasins; and
- Tire tracks/treads for comparison.

(*Id.* at 1-2.)  At issue are the items seized from the bedroom and kitchen of the residence in which Defendant was living on the south side of the property.[6]  (*Id.* at 75-76; Doc. 21-1.)

_____

[6] It appears these items were identified during the search authorized by the first warrant, but not seized until execution of the second warrant.  I note that it also appears from file stamps that law enforcement filed all of it search warrant returns at about the same time on January 19, 2021. (Gov. Ex. 1-3.) Although the first warrant return states that the items were "seized" pursuant to the first warrant, the same descriptions for the property seized were filed (although in different order) for both the first and second warrants. (Compare Gov. Ex. 1 at 75-87 and Gov. Ex. 2 at 17-30.)  As will be discussed below, the first warrant authorized law enforcement to seize items associated with the suspected burglaries committed by Mr. Varty.  (Gov. Ex. 1 at 2.)  The second warrant, also discussed below, seeks permission to seize, among other things, items discovered in the course of executing the first warrant.  Nevertheless, the issue is not, as

**A.** *Whether the First Warrant Contained a Substantial Basis for Concluding that Probable Cause Existed to Issue the Warrant*

The Fourth Amendment to the United States Constitution provides that "no [search] Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted). "In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'" *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam)); *see also United States v. Reivich*, 793 F.2d 957, 959 (8th Cir.

_____

presented by the parties, that law enforcement seized items beyond the scope of the first warrant. Rather, the parties focus on whether law enforcement had probable cause for the initial search.

1986) ("[T]he decision to issue the warrant is to be upheld if supported by substantial evidence on the record."). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (citation and internal quotation marks omitted). Therefore, "[r]eviewing courts must give substantial deference to the original determination of probable cause made by the judge who issued the warrant, and that determination will not be set aside unless the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir. 1995) (citing *Gates*, 462 U.S. at 238–39).

A substantial basis only requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citing *United States v. Koelling*, 992 F.2d 817, 823 (8th Cir.1993)). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant." *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (citations omitted). Defendant bears the burden of proving the warrants were issued without probable cause. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)). "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area

should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

### 1. The Parties' Arguments

Defendant argues that the affidavit supporting the first warrant lacked probable cause that evidence from the reported thefts would be found inside his residence. (Doc. 21-2 at 4.) Defendant asserts that while criminal activity was alleged to have taken place on the property, that property is shared with Mr. Varty and Mr. Varty inhabited one part of the property while Defendant inhabited another part of the property. (*Id.* (citing Def. Ex. A at 4-6.) Defendant points out that law enforcement had done surveillance of the property, determined the mobile home on the north side of the property was Mr. Varty's residence, knew which residence Mr. Varty parked his car near on a regular basis, and therefore could have easily narrowed the scope of their search. (*Id.* citing Def. Ex. A at 5-6; *People v. Randolph*, 4 P.3d 477, 481 (Colo. 2000) (citation omitted).)

Defendant argues that while a warrant to search multiple buildings is acceptable, "there must be probable cause to search all of the buildings which does not exist in this case because the Government never showed that Varty had access to those parts of the property." (Doc. 29 at 2.) He asserts that the area covered by the search warrant, 9.32 acres, is "too large"[7] to decide if there is a fair probability that evidence of a crime will be found in any of the five buildings on all that property. (*Id.*) Defendant avers that the warrant "barely mentions Varty being on the south side of the property at all. In fact, there is only one instance where Varty is observed on the south side of the property and he was walking away from the residence on the south side at the time." (*Id.* (citing Def. Ex. A at 6.) Defendant argues:

---

[7] I do not interpret this argument to mean that a 9.32 acre property is "too large" to search. Rather, I interpret Defendant's argument to assert that a property this large with multiple buildings and locations is too large and variegated to treat as a single place for search purposes.

Case 1:21-cr-00076-CJW-MAR    Document 31    Filed 03/23/22    Page 13 of 40

> There also must be evidence of a nexus between the contraband and the place to be searched. *United States v. Skarda*, 845 F.3d 370, 376 (8th Cir. 2016) (quotation marks omitted) (quoting *United States v. Tellez¸* 217 F.3d 547, 550 (8th Cir. 2000)). In this case, according to the Government, "We suspect and have probable cause to believe, Varty has committed multiple crimes of nature in proximity to Ralston's residence," is enough for a search of the entire property. (Docket No. 27, p. 3). The criminal activity alleged does not include any observations of Ralston's activities. The only person observed was Varty on a part of Ralston's property. Def Ex A, pp. 5-6. A person being on the same property, without more, does not provide a sufficient nexus between the contraband and place to be searched.

(*Id.*) Therefore, Defendant concludes that the first warrant was not supported by probable cause. Accordingly, Defendant seeks suppression of all items listed in his inventory filed at Docket No. 21-1.[8]

The Government, however, contends that the first warrant is supported by probable cause. According to the Government, the affidavit contained "a multitude of links between Varty and defendant and why evidence of the thefts could be found anywhere on the property, including where defendant lived." (Doc. 27-1 at 7.) The Government relies on information in the affidavit to show "links" between Mr. Varty and Defendant and to explain why Defendant's property, "in particular[,] was conducive to criminal activity."

> [Deputy Smith] was "aware that often, suspects in these types of crime, take stolen property to multiple locations to 'fence' and help avoid detection by Law Enforcement." (Gov't Ex. 1 at 5.) "The 'fence' may be utilized to conceal stolen property or the 'fence' may purchase the stolen property for a reduced price. They may also trade for other stolen property/narcotics. Often burglars will utilize storage sheds or other private property to conceal the stolen property." *Id.*

---

[8] All items seized from Defendant's home are not listed on the inventory of items Defendant seeks to suppress. Gov. Ex. 1 lists additional items that were found in Defendant's home, but were apparently not consequential to his charges in the instant case. (Gov. Ex. 1 at 84.)

. . .

> This is a very rural area. Ralston's property is ideal to reside and or utilize as a fence to conceal one's person as well as stolen property. Being on the fringes of two counties, this area does no[t] get heavy patrol from L/E. It is also situated in a manner which does not allow for much physical surveillance. The property and associated curtilage ha[ve] multiple outbuildings, vehicles, timber, and residences, all of which could be utilize[d] to hide and prevent L/E from locating property to which the possession is illegal. I am aware in executing search warrants of this nature, we often locate stolen property concealed in multiple areas and buildings on a property. This again, might deter L/E from locating all stolen or illegal property if they were to gain access to the property. I am aware burglars will generally conceal stolen tools inside of structures. One, this keeps their valuable property out of the elements but can also conceal its location from aerial surveillance using a drone or plane.

(*Id.* (citing Gov. Ex. 1 at 5, 7 (alterations in second paragraph in original)).)

The Government also argues that the affidavit contains the following statements that support the conclusion that evidence of crimes could be found anywhere on the property, including Defendant's residence:

- Mr. Varty was seen on the south side of the property walking toward a vehicle he was seen in several weeks earlier when he was found with a sawed-off shotgun and suspected methamphetamine;

- Defendant had previous convictions for property crimes related to theft/burglary and for weapons violations;

- Defendant was a known drug user;

- There was increased short-term traffic "at all hours" on the property, not limited to Mr. Varty's mobile home after Defendant was paroled, which was consistent with criminal activity; and

15

- Deputy Smith explained that burglars are commonly involved in drug distribution and stealing property is an easy way to get money to purchase or property to trade for drugs.

(*Id.* at 8 (citing Gov. Ex. 1 at 6-7).)  The Government also asserts that the affidavit in this case can be distinguished from the affidavit in *Randolph*, cited by Defendant, because the affidavit in that case was "bare bones" and the affidavit here is detailed.  (*Id.* at 8.) Therefore, according to the Government, the issuing judge had a substantial basis for finding the warrant was supported by probable cause.

### 2.    *Analysis*

It is undisputed that the affidavit in support of the search warrant contains strong evidence that Mr. Varty went on a burglary spree in Jones County, Iowa in December 2020, that the items he most frequently stole were power tools, and that he sold some of those stolen tools to the CS.  It is also undisputed that at the time, Mr. Varty resided in (or at least "frequented") a trailer home on the north side of the property and that he did not live with Defendant.  Defendant lived in a house on the south side of the property. While the distance between the two residences is not in evidence, a map of at least part of the property is in evidence.  (Gov. Ex. 1 at 1.)  The map is very poor quality, but it is clear that Bear Creek Road, which runs east and west, bisects that property into a north part and a south part.  (*Id.*)  Defendant's residence is separated from Mr. Varty's residence by Bear Creek Road.  (*Id.*)  In addition, it is clear that Mr. Varty's Jeep was likely used to commit the burglaries.  Witnesses described seeing the Jeep or a vehicle similar to the Jeep at burglary sites at and around the times of several burglaries.  The affidavit also clearly establishes that the Jeep was seen on the property, but primarily on the *north side* of the property near the brown trailer.  Mr. Varty has also been observed *on the property*, but not in or around Defendant's residence, although he had been seen on the south side of the road approaching a vehicle.  (*Id.*)  Although Deputy Smith stated

16

he personally saw Mr. Varty's vehicle "at Ralston's," in context, this means he saw the vehicle on the Ralston property, not at the residence on the south side of the property. (*Id.* at 5-6.) The entire paragraph containing this statement is about "the property."[9] Moreover, whenever Deputy Smith refers to the residence on the south side of the property, he calls the residence "Ralston's residence" or "the Ralston residence." (*Id.* at 5-6.) Even if Deputy Smith did once see Mr. Varty's Jeep at Defendant's residence, that alone provides almost no support for probable cause to search the residence. There is little evidence connecting Defendant to Mr. Varty's burglaries or any indication that Mr. Varty and Defendant were involved in some other kind of illegal activity, other than Defendant's criminal history which showed some historical thefts, one burglary, and illegal drug use as discussed below. (Gov. Ex. 1 at 10-26.)

The affidavit establishes that burglars often store their ill-gotten gains in storage sheds or other places on private property to avoid detection. A generous reading of the warrant establishes that "Ralston's property is ideal to . . . utilize as a fence to conceal one's stolen property." (*Id.* at 7.) *See Ventresca*, 380 U.S. at 109 (holding that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.") Finally, it is undisputed that the affidavit establishes that the stolen UTV had been seen on the property. Therefore, I find that the warrant supported probable cause to search Mr. Varty's trailer home and the outbuildings

---

[9]    Over the course of this investigation, Varty's vehicle, described above has been observed on multiple occasions at John Ralston's property located at XXX1 Bear Creek Road. The vehicle has been primarily parked on the northside of the property nearest the mobile home on the property. In speaking with a local resident of the area, [A.F.], he advised he has personally observed Varty on or about John Ralston's property on multiple occasions in the last several weeks. Your affiant has personally observed Varty's vehicle at Ralston's. I have also noticed there has been smoke coming from the flue at the mobile home. (Gov. Ex. 1 at 5-6.)

on the property and to seize the stolen UTV law enforcement had previously seen on the property. (Gov. Ex. 1 at 77-83, 85-88.)

The warrant does not, however, provide a nexus between the contraband and Defendant's residence on the south side of the property, other than the UTV, which could not be concealed inside Defendant's residence.[10] [11] *See Tellez*, 217 F.3d at 550. First, there is no evidence in the affidavit that Defendant was involved in the burglaries. As defendant points out, his being on the same property with Mr. Varty, without more, did not support probable cause that stolen goods would be found in his residence.[12] "Probable cause is not established 'by the presence of a person in a location known to be frequently involved in . . . other crimes." *United States v. Perez-Perez*, No. CRIM. 02-97, 2002 WL 34490513, at *5 (S.D. Iowa Aug. 21, 2002) (discussing an arrest warrant) (quoting *United States v. Everroad*, 704 F.2d 403, 406 (8th Cir. 1983)) (citation omitted), *aff'd*, 337 F.3d 990 (8th Cir. 2003).

Second, the affidavit describes the places law enforcement seeks to search with the broad terms "the areas sought in this warrant" and "this property." (Gov. Ex. 1 at 8.) The Government does not dispute that the property covers almost ten acres and multiple buildings. As discussed above, a road separates Defendant's residence from Mr. Varty's home, which creates an obvious boundary between the areas over which Mr.

---

[10] Deputy Smith agreed that the UTV could not have been concealed inside Defendant's residence. (Smith Hr'g Test.)

[11] Contraband was seized from a shed officers called "Ralston shed." (Gov. Ex. 1 at 83.) It is unclear if this shed was on the north or south side of the property. Defendant does not seek suppression of the items seized from this shed, a Stihl chain saw and a DeWalt radio.

[12] Deputy Smith testified that he received information over the years that Defendant was involved in the sale and distribution of narcotics. (Smith Hr'g Test.) He also stated that the property has been known over the years as a place to fence stolen property. (*Id.*) None of this information was included in the affidavit. A warrant is evaluated on the four corners, not on after-the-fact testimony provided at a hearing. *See Farlee*, 757 F.3d at 819. Deputy Smith testified that the sworn testimony he provided to Magistrate Denniger in addition to his affidavit concerned the layout of the property, not Defendant's alleged criminal activities. (*Id.* at 73-76.)

18

Varty and Defendant had at least apparent dominion and control. There is no evidence that Mr. Varty ever entered Defendant's residence. More importantly, the evidence that Mr. Varty was on the south side of the property or that criminal activity may have occurred on the south side of the property is minimal:

- On January 14, Deputy Smith observed Mr. Varty on the south side of the property walking towards a vehicle that no one asserts is registered to Defendant;

- Both Defendant and Mr. Varty are known drug users;

- Local residents reported increased short-term frequent traffic to and from Defendant's residence, which is consistent with criminal activity;

- Deputy Smith knows that "burglaries are also commonly involved in the distribution of illegal drugs;"

- "Ralston's property is ideal to . . . utilize as a fence to conceal one's person as well as stolen property. . . . The property and associated curtilage has multiple outbuildings, vehicles, timber, and residences, all of which could be utilize[d] to hide and prevent L/E from locating property to which the possession is illegal. [Deputy Smith was] aware in executing search warrants of this nature, [law enforcement] often locate[s] stolen property concealed in multiple areas and buildings on the property;"

- A local resident observed Mr. Varty "on or about John Ralston's property on multiple occasions in the last several weeks, . . . [and Deputy Smith] has personally observed Varty's vehicle at Ralston's;"

- "We suspect and have probable cause to believe, Varty has committed multiple crimes of [this] nature in proximity to Ralston's residence;" and

- Mr. Varty was residing on Defendant's property.

(*Id.* at 6-7.)

This information provides very little to support nexus between the contraband to be seized (stolen property, burglary tools, and items commonly used to assist in thefts or distribution of stolen property) and Defendant's residence. Clearly the criminal actor in the affidavit is Mr. Varty. Deputy Smith testified that he believes his affidavit and his statements to the magistrate conveyed that there was a mobile home on the north side of the road and a single-family residence on the South. While that may have been Deputy Smith's intent, I will first observe, as I did at the hearing, that, at least within the four corners of the affidavit and supporting documentation this arrangement of the various structures was unclear. More specifically, the affidavit was less than clear in explaining that there was a residence on the south side of the road where Defendant was known to reside.

Moreover, the affidavit tends to conflate, "the property" or "Ralston's property" with "Ralston's residence" in a way that tends to overstate the nexus between the residence and any suspected criminal activity. [13]   The place to be searched described in the warrant application is the 9.32 acres owned by Defendant's mother and includes the mobile home and the single-family residence. Generally, the affidavit tends to refer to 9.32 acres straddling Bear Creek Road as "the property" or "Ralston's property. For example,

> . . . Varty's vehicle, described above has been observed on multiple occasions at John Ralston's property located at XXX1 Bear Creek Road. The vehicle has been primarily parked on the northside of the property nearest the mobile home on the property. In speaking with a local resident of the area, [A.F.], he advised he has personally observed Varty on or about John Ralston's property on multiple occasions in the last several weeks.

---

[13] I do not mean to suggest that there was any effort to intentionally conflate the larger property with Defendant's residence or otherwise confuse the issue.

(*Id.* at 5-6.) In this context it is clear that "John Ralston's property" and "the property" refer to real estate on both sides of the road. However, the affidavit does not consistently distinguish the single-family residence in which Defendant was known to reside and the 9.32 acre parcel. For example, the affidavit states, "Ralston's residence is also situated on the edge of Jones and Jackson County. This is a very rural area. Ralston's property is ideal to reside and or utilize as a fence to conceal one's person as well as stolen property." (*Id.* at 7.) While these sentences may both be literally true, it is by no means apparent that the single-family residence is intelligibly distinguished from the remainder of the parcel as being at the edge of the county or more rural. Thus, this is an example, perhaps, of merely conflating the two terms. More troubling are the following two statements, "I [sic] aware the thefts and burglaries mentioned in this affidavit have all occurred within several miles of John Ralston's residence where we believe Varty and Ralston are residing" and "We know by speaking to residents situated near the Ralston residence about increased traffic to and from the residence." (*Id.* at 5, 7.) Even if these latter examples are merely conflating the single-family residence with the larger property, they tend to show a nexus between Defendant's residence and criminal activity that is not supported by evidence known to law enforcement.

Moreover, the affidavit does not tie Mr. Varty to Defendant's residence: it never mentions that Mr. Varty was seen in or even near Defendant's residence. "Proximity to Ralston's residence" cannot be regarded seriously as meeting the specificity standards required under the law. At most, the affidavit states that Mr. Varty was seen "on the south side of the property walking towards a vehicle." The owner of the vehicle is not identified. There is no indication how close Mr. Varty was to Defendant's residence at this time, only that the vehicle was parked close to the front of the property. The affidavit goes on to say that when officers "made a second pass on the roadway, this vehicle was no longer present." (*Id.* at 6.) That Mr. Varty was pulled over driving a vehicle on an

earlier date with contraband in the vehicle does not add to probable cause that contraband would be found in Defendant's residence because the contraband found in the vehicle at that time was a sawed-off shotgun and suspected methamphetamine. The only connections the affidavit draws between the actual crimes described and drugs are the facts that both Defendant and Mr. Varty are known drug users and that in Deputy Smith's experience, burglaries are commonly also involved in the distribution of illegal drugs. I have no reason to believe this information is untrue. Also, such information may help establish probable cause in a case where there is evidence of drug sales on the property or where there was other evidence of a broader drug trafficking operation. No such evidence exists in this case. The only specific evidence in the affidavit involving Mr. Varty or Defendant is that they were drug users, not drug distributers. Although Deputy Smith testified that he believed Defendant was trafficking in drugs because his deputies had seen short-term traffic on both the north and south sides of the property, he did not testify that anyone had witnessed a sale or exchange of any kind at Defendant's residence. (Smith Hr'g Test.) Likewise, if Deputy Smith saw Mr. Varty's Jeep at Defendant's residence on one occasion, that, alone, means little without evidence that Defendant had any involvement in the burglaries that are the target crimes of the search warrant. Defendant's and Mr. Varty's criminal histories, which were attached to the warrant application, likewise, do not reference drug distribution convictions. (Gov. Ex. 1 at 9-26.) Though Defendant's property is "ideal" to conceal and "fence" stolen property, that is of little consequence when there is no other nexus to criminal activity. In addition, as pointed out during Defendant's cross-examination of Deputy Smith, his training and experience tended to show that stolen property might be secreted just about anywhere. Certainly it was *possible* Defendant's residence could be involved in fencing stolen goods, but the affidavit provides little reason (other than proximity to Mr. Varty's residence) to believe it was at all *probable*.

22

While I have parsed the relevant warrant statements, looking at them in the context of the entire affidavit and all its attachments as I must, the totality of these circumstances does not support a finding that evidence of criminal activity would be found in Defendant's residence. Although close cases should be resolved in favor of upholding warrants, *Ventresca*, 380 U.S. at 109, I cannot lose sight of the "special" privacy protections afforded to a person's home. *See Lange v. California*, 141 S. Ct. 2011, 2018 (2021) (discussing warrantless search exceptions); *United States v. Herron*, 215 F.3d 812, 815 (8th Cir. 2000) (holding that the *Leon* good faith exception did not save a warrant search of a home and reasoning that a person's home deserves special protection under the Fourth Amendment).

The defendant in *United States v. Lynch* asserted arguments similar to those Defendant asserts in this case: that the application in support of the search warrant for his residence and surrounding outbuildings was overbroad because the facts only supported issuance of a warrant for the search of the outbuildings on his property and not the residence. 322 F.3d 1016, 1017 (8th Cir. 2003). The Eighth Circuit disagreed, stating that the information in the affidavit and search warrant "clearly establish[ed] probable cause to search the entire property." *Id.* The application detailed police observations of two suspected drug dealers arriving at the residence in an automobile, entering the residence, and exiting the residence carrying two small items that they placed in the automobile. *Id.* The defendant then walked behind one of the outbuildings, returned with a large bucket, put the bucket into a storage box that he had in the trunk of his own car, and then placed the storage box into the suspected dealers' trunk. *Id.* Police stopped the suspected dealers for a traffic violation, searched the car, and found materials for making methamphetamine. *Id.* *Lynch* held that "[t]his alone would support the issuance of a warrant to search the entire property; however, there was more." *Id.* The affidavit also included information from confidential informants stating that the defendant

23

allowed one of the drug dealers to use his home to cook methamphetamine, that he sold anhydrous ammonia to the drug dealer, and that he was dealing marijuana. *Id.* at 1017-18. The warrant also "listed prior arrests and convictions of [the drug dealers] for various narcotics crimes" and the information that a recent search of one of the dealers' residences turned up materials and substances used to manufacture methamphetamine. *Id.* at 1018; *Cf. Randolph*, 4 P.3d at 482 ("The most serious problem with the affidavit . . . is its geographic scope. The affidavit listed at least five separate buildings without connecting the alleged criminal activity to each of those buildings.").

As discussed above, there is nothing tying Defendant to Mr. Varty's burglary activity other than the fact that they both live on a piece of property owned by Defendant's mother. (Gov. Ex. 1 at 1.) However, because Defendant's mother is in a care facility, it is unclear whether Defendant and Mr. Varty are both akin to tenants of Defendant's mother or whether Defendant is more akin to Mr. Varty's landlord.[14] Whether Defendant was Mr. Varty's landlord or they were both tenants of Defendant's mother is of little moment. Neither relationship establishes Mr. Varty's right to access Defendant's residence, much less his actual use of it. In either case, Mr. Varty's allegedly criminal actions do not, by themselves, implicate Defendant. If these relationships by themselves implicated people in criminal activity, tenants who lived in the same building as a criminal could be subject to searches of their homes. Here, Deputy Smith testified that he had no information that Mr. Varty even knew Defendant prior to moving onto his property. (Smith Hr'g Test.) Thus, the relationship between Mr. Varty and Defendant could merely be as neighbors who happened to be tenants or they could be in a landlord/tenant

---

[14] Deputy Smith testified that "under the eyes of the state," Mr. Varty was a tenant, and he did not have any information that Defendant was a landlord. (Smith Hr'g Test. at 31.) Deputy Smith called Defendant a "tenant," not a "defacto property owner" in his mother's absence. (*Id.*)

relationship. Mr. Varty being seen "on" a property that is almost 10 acres does not establish any kind of personal between them, much less a criminal link.

The case at bar can be distinguished from *Lynch*. Here, unlike in *Lynch*, there was no detail as to what "traffic" to Defendant's residence involved if the affidavit is interpreted as showing such traffic to the residence itself rather than the entire 9.32 acre parcel. For example, the affidavit does not disclose who was coming and going, what types of items came and went from the residence, or other information that would associate it with possible trafficking of drugs or stolen property. Defendant's most recent drug charges were misdemeanor charges for possession of paraphernalia and misdemeanor possession of a controlled substance in April and November 2019. (Gov. Ex. 1 at 21-22.) Defendant's most recent theft charge was a fifth degree misdemeanor theft charge (possess/control under $500) from March 2019. (*Id.* at 21.) These unrelated and remote crimes do not indicate that Defendant would participate in Mr. Varty's crimes and do not establish a nexus between those crimes and Defendant's residence.[15] While it is true that Mr. Varty was selling the tools he stole, there is no information that he did so from Defendant's residence. Mr. Varty did not meet the CS at Defendant's residence. There is also no indication where the photo Mr. Varty sent to the CS on Facebook Messenger was taken, although Deputy Smith admitted it was "potentially" taken in the trailer on the north side of the property.[16] Thus, I find the warrant did not provide a substantial basis to support the judge's finding of probable cause to search Defendant's residence.

---

[15] Defendant committed one felony burglary in 2016, but I find this crime, considered under the totality of the circumstances, is too remote in time to contribute significantly to probable cause that Defendant was involved in Mr. Varty's December 2020 burglaries. (Gov. Ex. 1 at 16.)

[16] Defense Counsel asked Deputy Smith if it would have made sense to run across the road in the winter wearing moccasins (presumably to take the photographs inside Defendant's residence). (Hr'g Trans. at 59.) Deputy Smith answered that it would not surprise him. (*Id.*)

Accordingly, I recommend that the part of the warrant authorizing the search of Defendant's residence, "[a] single story white vinyl sided single family home built in 1980 consisting of 720 square feet" (Gov. Ex. 1 at 1), be severed from the warrant. *See United States v. Coleman*, 909 F.3d 925, 931 (8th Cir. 2018) ("[W]here [an overbroad] warrant is invalid only in part, the warrant is 'severable,' and items seized pursuant to valid portions of the warrant need not be suppressed.") (quoting *United States v. Timley*, 443 F.3d 615, 622 (8th Cir. 2006)) (alterations in original). Unless the evidence seized in the search of Defendant's residence can be admitted into evidence based on the *Leon* good faith exception discussed below, I recommend the evidence be suppressed.

## B.    The *Leon* *Good Faith Exception*

I have recommended the Court find there was no substantial basis supporting the judge's finding of probable cause for the search of Defendant's residence. I further find that the *Leon* good faith exception does not apply to the relevant portions of the warrant.

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007).

*Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate.

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)) (emphasis in original).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted).

Defendant's reply brief is clear that he relies on the third *Leon* scenario, that "the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" to support his argument that the *Leon* good faith exception does not apply. (Doc. 29 at 3.)

Both parties cite *United States v. Herron*, 215 F.3d 812 (2000) in support of their arguments. *Herron's* analysis, which I find apposite in this case, also focused on the third scenario. The Government succinctly summarizes the case in the following way:

> In *Herron*, a judge issued a warrant to search defendant's farm for the presence of marijuana plants. 215 F.3d at 813. The affidavits in support of that warrant stated that relatives of the defendant had been found growing marijuana on a nearby farm, that one of the relatives had been staying with

27

defendant several months earlier, and that the defendant had two prior convictions for cultivating marijuana, two and fourteen years prior, respectively. *Id.* The Court of Appeals for the Eighth Circuit held that the affidavits so tenuously connected the defendant to marijuana production that "the lack of probable cause in the affidavits would have been apparent to reasonable officers" and *Leon* did not apply. *Id.* at 815.

(Doc. 27-1 at 10.)

Defendant argues that this case is similar to *Herron* because the affidavit "does not contain supporting indicia such that the good faith exception should apply." (Doc. 21-2 at 6.) Defendant asserts that there is little in the affidavit tying him or his residence to the reported thefts other than the fact that Mr. Varty resided in a trailer on the property. (*Id.*) Defendant argues that because the geographic area covered by the warrant was so broad and the amount of information about his connection to illegal activity was so minimal, the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." (Doc. 29 at 3 (citing *Randolph*, 4 P.3d 477 ("The court held that the officers' reliance on the warrant was not objectively reasonable because the warrant failed to specify where the drug activity observed by the informant had taken place.").)

The Government responds that "several pages in the affidavit in this case provide significant detail on defendant's connection to the crimes." (Doc. 27-1 at 11.) The Government distinguishes this case from *Herron* where the connection to the defendant was remote in time because it is clear in the affidavit that Defendant and Mr. Varty were living on the property at the relevant time. The Government further asserts that "activity linked to crime, including thefts, drugs, and firearms had 'increased' after defendant was paroled and living on his property once more." (*Id.* (citing Gov't Ex. 1 at 6–7).) The Government's final argument is that the warrant was signed by an experienced judge, a former prosecutor with knowledge of warrants and the probable cause standard. (*Id.*)

28

Therefore, according to the Government, the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

While the Government is correct that the information in the affidavit is not remote in time, it is not correct that several pages in the affidavit provide significant detail on Defendant's connection to the crimes. As documented above, Defendant himself is mentioned relatively few times in the affidavit. Perhaps the absence of probable cause with respect to Defendant's residence is somewhat disguised by the surfeit of detail tying Mr. Varty and his residence to criminal activity. While Mr. Varty's connection to "the property" might be established, his connection to Defendant's residence and Defendant's involvement in Mr. Varty's burglary spree is not. There is, frankly, not even any evidence in the affidavit that Mr. Varty and Defendant ever crossed paths on the 9.32 acres that constitute the property or anywhere else, unless the reference to the Jeep being parked "at Ralston's" is taken out of context and interpreted to mean the Jeep was parked at Defendant's residence, and then it is assumed that Mr. Varty was inside Defendant's residence or in the company of Defendant at the time. To the extent the Government asserts that Defendant's history of drug use created the required nexus between the criminal activities alleged in the affidavit and his residence, that argument is unavailing. Furthermore, the short-term frequent traffic from Defendant's residence mentioned in the affidavit proves nothing because rather than being fleshed out by relevant facts tying Defendant and his residence to criminal activity, the short term traffic is tied only to general statements of knowledge that have no connection to the facts of the case: (1) short-term frequent traffic is consistent with criminal activity, (2) burglaries are commonly involved with the distribution of illegal drugs, and (3) stealing property is an easy way to get money to purchase drugs or to trade for drugs. (Gov. Ex. 1 at 7.)

Likewise, the affidavit's attempt to create a connection between Defendant's residence and Mr. Varty's criminal activity fails to do so. After stating that criminals

29

will often commit burglaries/thefts close to their places of residence, the affidavit states that "Varty has committed multiple [burglaries/thefts] in proximity to Ralston's residence. We just received information that a recent burglary was reported yesterday. This property is 2.55 miles (as the crow flies) from the Ralston residence." (*Id.* at 6-7.) This is no doubt literally true. But again, the statement is phrased in a manner to implicate Defendant's residence (as opposed to the 9.32 acre parcel) in a manner unsupported by the evidence. Thefts attributable to Mr. Varty were in proximity to *Mr. Varty's* residence and approximately 2.55 miles from *Mr. Varty's* residence. Pointing out the proximity of the crimes to Defendant's residence might tend to support probable cause if Defendant and/or Defendant's residence were otherwise tied to the burglaries such as by information showing it was used to fence property stolen by Mr. Varty. As written, the affidavit contains nothing to make Defendant's residence – as opposed to Mr. Varty's residence – a place where law enforcement was likely to find evidence of the target crimes. The efforts to implicate Defendant's residence flies in the face of the common sense that drives the inquiry into whether probable cause existed to issue this warrant. *See Gates*, 462 U.S. at 231-32.

Moreover, the Government's argument that criminal activity related to theft, drugs, and firearms increased after Defendant was paroled to the property in November 2020 is without merit. Although the affidavit focuses on a series of burglaries that occurred in December 2020 within "several miles" of the property, there is no indication that the number of burglaries was high for the area or represented an increase over the past number of burglaries in the area. In fact, other than the above-mentioned statements that stealing property is a way to obtain money to buy drugs and that Defendant and Mr. Varty are both known drug users, drugs are never mentioned. The only mention of a firearm is the sawed-off shotgun found in the vehicle Mr. Varty was driving in a traffic stop. The affidavit says nothing about increased drug or firearms crime.

Although officers executing the search warrant undoubtedly respected the judge who signed the warrant, perhaps for her experience, among other things, the standard for evaluating the sufficiency of the warrant, itself, is an objective one. *Leon*, 468 U.S. at 919 n.20 ("We emphasize that the standard of reasonableness we adopt is an objective one."); *United States v. Goody*, 377 F.3d 834, 836 (8th Cir. 2004) ("An officer's objective good faith is determined by asking 'whether a reasonably well trained officer would have known that the search was illegal *despite* the magistrate's authorization.'") (quoting *Leon*, 468 U.S. at 922 n.23) (emphasis added). Admittedly, officers in the field may not have been able to ignore the experience of the judge who signed the first warrant. *See United States v. Bieri*, 21 F.3d 811, 816 (8th Cir. 1994) (although warrant was valid, opining that if court had considered *Leon*, deputy "could easily have assumed the warrant, issued by a judge with many years of experience, was lawful."); *United States v. Hernandez*, No. CR. 08-198(1)JRT/RLE, 2008 WL 4748576, at *17 & n.5 (D. Minn. Oct. 28, 2008) (finding warrant supported by probable cause and reasoning, in part, that a respected district court judge with criminal law experience concluded that the warrant was lawful and "we could not reasonably expect law enforcement officers to assess the lawfulness of the Warrant differently."). That being said, a warrant must still establish "a nexus between the contraband and the place to be searched." *Tellez*, 217 F.3d at 550 (citation omitted).

Here, although the affidavit is not "bare bones," like the affidavit in *Randolph*, 4 P.3d at 482, the affidavit also does not provide a nexus between stolen tools or other contraband and Defendant's residence. It is possible to become distracted by the impressive level of detail and quantity of information about some aspects of the investigation set forth in the affidavit and the care with which Deputy Smith laid out the timeline, described the burglaries, and wove in information gleaned from this training and experience. However, none of that saves the part of the warrant authorizing a search

of Defendant's residence when it is examined specifically to tease out the required nexus to the residence.

I find that the affidavit so tenuously connected Defendant or his residence to the burglaries, if at all, that the lack of probable cause in the affidavits would have been apparent to reasonable officers, "despite the issuance of a warrant." *See Lopez-Zuniga*, 909 F.3d at 909; *Herron*, 215 F.3d at 815. The facts do not support a conclusion that an objectively reasonable officer could have believed the search of Defendant's residence was lawful. The facts simply are not "close enough to the line of validity" to "push[] this case into the gray area created by *Leon*." *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989).

Accordingly, the evidence seized in the search of Defendant's residence should be suppressed. I recommend that the District Court grant Defendant's Motion to Suppress. (Doc. 21.)

C.      ***Fruits of the Poisonous Tree***

The second search warrant authorized law enforcement to search the same buildings and property as the first warrant, a black Chevrolet truck with an extended cab and affixed black topper registered to Defendant's mother, and a cream-colored 5th wheel camper with unknown identifying numbers. (Gov. Ex. 2 at 1.) The third search warrant authorized law enforcement to obtain a urine sample from Defendant. (Gov. Ex. 3 at 1.) Defendant argues that both warrants are fruits of the poisonous tree that was the search of his residence pursuant to the first warrant. The Government contends there is no poisonous tree and therefore, evidence seized pursuant to the warrants need not be suppressed.

1.    *Whether Evidence Seized Pursuant to the Second Warrant Must be Suppressed as Fruit of the Poisonous Tree*

    a.    *The Warrant*

The second warrant authorized the seizure of, among other things, specific drugs and drug paraphernalia, a Samsung cell phone, two firearms, and ammunition located when officers searched Defendant's residence pursuant to the first warrant.   In relevant part, the warrant states the following.  Information discovered during the initial search of Defendant's home are in bold typeface and underlined.

> On today's date, Your affiant conducted a search warrant at XXX1 Bear Creek Road. . . . **In John Ralston's residence, inside of his bedroom, L/E observed a Winchester 1200 pump action 20 gauge shotgun that had the barrel removed. This gun had a serial number affixed L 1256664. In a gun cabinet in this same bedroom, a suspected .22 caliber long rifle with a wooden stock and affixed scope was observed. Without further search/seizure we cannot verify whether there is a serial number affixed to the firearm. L/E also observed a handgun holster in this residence indicated [sic] there may be an additions [sic] firearm(s). L/E a [sic]12 gauge slug round near the gun cabinet as well as a .22 caliber cartridge. In this bedroom on the headboard, a suspected methamphetamine bong was observed. Just inside the door of the residence there were several hypodermic syringes on the floor. In the kitchen, we observed several glass methamphetamine pipes and numerous baggies suspected for packaging illegal narcotics. There was also a cen-tech [sic] digital scale located near the drug packaging materials. Throughout the residence we located numerous gem bags containing suspected methamphetamine residue. John Ralston has a known drug history. He is also a several time convicted felon, prohibiting him from legally possessing firearms or ammunition. During a custodial interview with [S.E.], she denied possessing any firearms or ammunition inside the Ralston residence.**

> In the mobile home where the other suspects were detained, L/E observed a large quart sized bag containing suspected marijuana. There was also a large marijuana bong and a homemade insufflation device manufactured from a tube and affixed prescription bottle. Both Varty and [H.B.] admitted

33

to being drug users. During a custodial interview, ***Varty indicated that he gave John Ralston two firearms about one month earlier. He described one as a Winchester pump action 12 gauge and .22 caliber rifle with a folding stock. The Winchester we observed in the Ralston home was a 20 gauge and the .22 caliber with a folding stock had not been located, indicating there are additional firearms yet to be observed/discovered by L/E.***[17] Varty admitted to partaking in several thefts and burglaries and possessing stolen items. We are aware all suspects mentioned have full access to all the curtilage, vehicles, and outbuildings on the property.

**While conducting our search warrants, we located a large amount of stolen property in both residences** and adjacent curtilage. We observed a large Canilite 5th wheel camper located on the property, described above. There were pedestrian tracks in the snow showing person(s) had been frequenting the camper. This camper was not listed on the search warrants for search. Based on my knowledge and experience, those persons committing burglaries and thefts, often utilized many areas/structures on properties to conceal illegally possessed items. **I am aware both residences searched today, contained a large amount of personal effects and stolen property and there was not a lot of addition [sic] room to store property.** We also located a Chevy truck described above that contains tools and a newer silver toolbox. Based on other items of stolen property, they are consistent with property stolen from other burglaries. Gaining access to this pickup and camper, we believe, will reveal more stolen/property and contraband.

(*Id.* at 1-3 (emphasis added).)

In executing the second warrant, law enforcement seized the items Defendant seeks to suppress shown in Defendant's inventory, i.e., firearms, ammunition, and a cell phone. (Doc. 21-1 at 2.)

### b.    Analysis

"The exclusionary rule 'reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to

---

[17] This italicized quotation is discussed further below because the record is unclear about whether law enforcement's observation of firearms in the residence prompted this discussion.

be derivative of an illegality or fruit of the poisonous tree.'" *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984) (noting internal marks omitted) (ellipses in original). "The sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that information." *United States v. Davis*, 760 F.3d 901, 903 (8th Cir. 2014) (citing *United States v. Hernandez Leon*, 379 F.3d 1024, 1027 (8th Cir. 2004)). Specifically, "when faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *United States v. Dessesaure,* 429 F.3d 359, 367 (1st Cir. 2005).

Defendant argues that because the second warrant "refers to suspected drugs, ammunition, and firearms which were found when the first warrant was executed," the warrant is fruit of a poisonous tree. (Doc. 21-2 at 6.) Defendant is correct. The information highlighted in bold typeface and underlined is fruit of a poisonous tree and must be excised.

In the last paragraph, the highlighted text describes the "residences." Those references must be edited to only refer to Mr. Varty's residence. The edited affidavit does not support probable cause to search Defendant's residence.[18] In fact, the excised warrant states that "all suspects mentioned have full access to all the curtilage, vehicles, and outbuildings on the property" and therefore specifically provides that Mr. Varty had no access Defendant's residence. Finally, although Mr. Varty stated that he gave Defendant two firearms a month earlier, it is impossible to tell on this record whether that statement itself was the fruit of law enforcement's inquiry about the weapons they had seen in Defendant's residence or if it came unprompted. Even if the statement was

---

[18] The search of the rest of the property is not at issue in Defendant's motion.

not the fruit of the prior search, it does not create probable cause to believe weapons were present in the residence a month later. The statement is even less reliable given the lack of evidence in the first and second warrants that Mr. Varty and Defendant knew each other, let alone that Mr. Varty had ever seen weapons in Defendant's home. Again, a person's home is afforded special protections against invasions of privacy. *Lange*, 141 S. Ct. at 2018. An uncorroborated tip from someone seemingly unconnected to Defendant other than by virtue of living in different homes on the property does not support probable cause for the search of Defendant's home. I therefore recommend granting Defendant's Motion to Suppress. (Doc. 21.)

> **2.** *Whether Evidence Seized Pursuant to the Third Warrant Must be Suppressed as Fruit of the Poisonous Tree*

> *a.* *The Warrant*

The third warrant sought "one legal urine and/or blood specimen to be obtained at the discretion of L/E, from John Ralston . . . ."[19] (Gov. Ex. 3 at 1.) Information discovered during the initial search[20] of Defendant's home are in bold typeface and underlined.

> On today's date, Your affiant conducted a search warrant at XXX1 Bear Creek Road. **While securing the scene, John Ralston and [S.E.] were detained inside of the single story white vinyl sided house on the south side of the property.** Colton Varty and [H.B.] were detained in the modular home on the north side of the property. While conducting a search for items associated with our valid State of Iowa search warrants, other items, the possession of which are illegal were located inside of [Varty's residence].[21] **In John Ralston's residence, inside of his bedroom, L/E observed a Winchester 1200 pump action 20 gauge shotgun that had the**

---

[19] Defendant provided a urine specimen.

[20] Deputy Smith testified he applied for the second and third warrants simultaneously. Thus, the issue is whether the urine sample is also fruit of the search pursuant to the first warrant.

[21] I have modified the reference to "the residences" to excise fruit of the search of Defendant's residence.

**barrel removed. This gun had a serial number affixed L1256664. In a gun cabinet in this same bedroom, a suspected .22 caliber long rifle with a wooden stock and affixed scope was observed. Without further search/seizure we cannot verify whether there is a serial number affixed to the firearm. L/E also observed a handgun holster in this residence indicated [sic] there may be an additions [sic] firearm(s). L/E a [sic]12 gauge slug round near the gun cabinet as well as a .22 caliber cartridge. In this bedroom on the headboard, a suspected methamphetamine bong was observed. Just inside the door of the residence there were several hypodermic syringes on the floor. In the kitchen, we observed several glass methamphetamine pipes and numerous baggies suspected for packaging illegal narcotics. There was also a cen-tech [sic] digital scale located near the drug packaging materials. Throughout the residence we located numerous gem bags containing suspected methamphetamine residue.** John Ralston has a known drug history. He is also a several time convicted felon, prohibiting him from legally possessing firearms or ammunition. During a custodial interview with [S.E.], she denied possessing any firearms or ammunition inside the Ralston residence.

John Ralston has a known and extensive drug history based on his CCH. John Ralston has several firearm related convictions, and multiple felony convictions. He has served both state and federal prison time. Your affiant also conducted narcotic investigations as a part of his job as an investigator. In working with confidential sources in official capacity, I am aware John Ralston has been involved in the use and sale of illegal drugs, primarily to include methamphetamine. During this investigation, I am aware there has been a lot of vehicle traffic to and from John Ralston's. Often this traffic is short-term. From my training and experience this is consistent with a person selling illegal narcotics from their place of residence.

Under federal code, persons prohibited from possessing firearms are those convicted as felon. [sic] It is also illegal to possess a firearm and ammunition as a drug user. **Based on the narcotic related items observed in the Ralston home, I believe probable cause exists to believe he is a drug user and involved in the distribution of narcotics.** I am aware L/E can obtain a urine sample from Ralston using a sterile specimen collection kit. The sample can be sealed and sent to the Iowa DCI lab to confirm the presence of illegal narcotics/metabolites possessed by the person in their

system. This lab report with quantitative confirmation of the presence of drugs is vital for evidence in criminal prosecution.

(*Id.* at 2 (emphasis added).)

### b. Analysis

Defendant argues that because the third warrant was "based upon drug paraphernalia and suspected drugs which were found when the first warrant was executed," there is no independent basis for the warrant, and therefore, evidence obtained pursuant to the warrant must be suppressed. (Doc. 21-2 at 6-7.)

Defendant is correct. The information in bold and underlined in the warrant application is fruit of a poisonous tree and must be excised. *Davis*, 760 F.3d at 903. Without evidence seized in the search of Defendant's residence, there is no evidence that Defendant possessed a firearm in violation of the law. *See id.*; *Dessesaure,* 429 F.3d at 367. One purpose of the warrant to obtain a urine sample because it is illegal to *possess a firearm and/or ammunition* as a convicted felon or as a drug user is thwarted when the warrant no longer contains evidence that Defendant possessed a firearm and/or ammunition. The analysis does not end here, however, because the third warrant application seeks evidence of drug crimes not related to weapons possession: "I believe probable cause exists to believe [Defendant] is a drug user and involved in the distribution of narcotics." (Gov. Ex. 3 at 2.)

Although the excised warrant states that "[i]n working with confidential sources in [his] official capacity, [Deputy Smith] is aware John Ralston has been involved in the use and sale of illegal drugs;" Defendant has an "extensive" drug history; Defendant has multiple felony convictions and has served both state and federal prison time; and there has been "a lot of vehicle traffic to and from John Ralston's," often short-term, that information does not support probable cause for Defendant to provide a urine sample. Though this is the first indication across the three warrants that Defendant might be

38

involved in drug distribution, the allegation is neither corroborated nor given indicia of reliability because the application does not contain information about the confidential sources. (Compare Gov. Ex. 2 to Gov. Ex. 1 at 69 (Informant's Attachment).) Stating that Defendant "has been involved" in the sale of illegal drugs without any other information, especially without a date, means this information adds nothing to probable cause. Likewise, as discussed in part III.A, "short term traffic," without any details as to who is coming and going and what they are doing on the property does nothing to establish probable cause. Defendant's criminal history, without more, does not justify obtaining a urine sample. I therefore recommend granting Defendant's Supplemental Motion to Suppress. (Doc. 28.)

## D.    *Recommendation*

I recommend granting Defendant's motions to suppress. (Docs. 21, 28.) Defendant's Motion to Suppress at Docket 21 seeks only to suppress certain evidence seized in the search of his residence.[22] (Doc. 21-1.) The rest of the evidence seized in the search executed pursuant to the first warrant need not be suppressed. Defendant's Supplemental Motion to Suppress at Docket 28 seeks only to suppress evidence obtained from the urine sample the third warrant authorized law enforcement to collect. This motion should also be granted because the warrant was fruit of the poisonous tree.

In the alternative, if the District Court disagrees with me and finds that the first warrant authorized the search of Defendant's residence, then I recommend denying both Defendant's motions in their entirety.

---

[22] If the District Court disagrees with Defendant and finds the evidence at issue was seized pursuant to the second warrant rather than the first warrant, I still recommend granting Defendant's motion because the second warrant is fruit of the poisonous tree as it relates to the evidence at issue in Defendant's Motion to Suppress at Docket 21.

### III. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **GRANT Defendant's Motion to Suppress (Doc. 21) and GRANT Defendant's Supplemental Motion to Suppress (Doc. 28).**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 23rd day of March, 2022.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa