**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

JOHN LEE RALSTON,

               Defendant.

No. 21-CR-76-CJW-MAR

**ORDER**

---

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................. 2

II.   STANDARD OF REVIEW.................................................. 2

III.  FACTUAL BACKGROUND ............................................... 5

IV.  ANALYSIS...................................................................... 12

      A.    Probable Cause and the First Search Warrant................................. 12

           1.    Evidence Establishing a Connection Between Varty
                and Defendant ............................................................. 15

           2.    Suitability of Defendant's Property for Criminal Activity .......... 17

           3.    Defendant's Known History ............................................. 20

           4.    Totality of the Circumstances........................................... 23

      B.    Leon Good Faith Exception ...................................................... 24

      C.    Probable Cause Established by Subsequent Search Warrants............... 26

V.    CONCLUSION................................................................... 28

# I.    INTRODUCTION

This matter is before the Court on the government's objections (Doc. 35) to the Report and Recommendation ("R&R") of the Honorable Mark A. Roberts, United States Magistrate Judge, recommending that the Court grant defendant's Motion to Suppress Evidence. (Doc. 31).

On February 7, 2021, defendant filed a Motion to Suppress. (Doc. 21). The government timely resisted the motion. (Doc. 27). On February 14, 2022, defendant filed a supplemental motion to suppress, (Doc. 28), and on February 17, 2022, defendant filed a reply to the government's motion. (Doc. 29). On March 3, 2022, Judge Roberts held a hearing on the motion (Doc. 30) and on March 23, 2022, he issued his R&R, recommending that the Court grant defendant's motion (Doc. 31). On April 13, 2022, the government timely filed its objections to the R&R. (Doc. 35).

For the following reasons, the Court **overrules in part and sustains in part** the government's objections, **adopts in part and rejects in part** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

# II.    STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge

> to review an issue *de novo* if no objections are filed, it does not preclude
> further review by the district judge, *sua sponte* or at the request of a party,
> under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review de novo
any issue in a magistrate judge's report and recommendation at any time.  *Id.*  If a party
files an objection to the magistrate judge's report and recommendation, the district court
must review the objected portions de novo.  28 U.S.C. § 636(b)(1).  In the absence of an
objection, the district court is not required "to give any more consideration to the
magistrate [judge]'s report than the court considers appropriate."  *Thomas*, 474 U.S. at
150.

De novo review is non-deferential and generally allows a reviewing court to make
an "independent review" of the entire matter.  *Salve Regina Coll. v. Russell*, 499 U.S.
225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo
review is "distinct from any form of deferential review").  The de novo review of a
magistrate judge's report and recommendation, however, only means a district court
"'give[s] fresh consideration to those issues to which specific objection has been made.'"
*United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609,
at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments
affect Section 636(b))).  Thus, although de novo review generally entails review of an
entire matter, in the context of Section 636 a district courts required de novo review is
limited to "de novo determination[s]" of only "those portions" or "specified proposed
findings" to which objections have been made.  28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review
would only be required if objections were "specific enough to trigger de novo review."
*Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989).  Despite this "specificity"
requirement to trigger de novo review, the Eighth Circuit Court of Appeals has

"emphasized the necessity of . . . retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full *de novo* review" if the record is concise. *Id.* Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007),

but a district court may still reject the magistrate judge's report and recommendation when the district court "is left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: A district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III.    FACTUAL BACKGROUND

Based on the evidence submitted at the suppression hearing, Judge Roberts made extensive factual findings. The government has not objected to any of Judge Roberts' factual findings, so the Court reviews them for clear error. Finding none, the Court adopts Judge Roberts' factual findings without modification.

> This case involves three search warrants issued and executed at two different times on January 15, 2021. The dispute before the Court principally arises out of the first search of Defendant's residence located on real property in rural Jones County, Iowa ("the property"). The property

5

is bisected by Bear Creek Road with structures on either side. Prior to the search, investigators had identified Colton Varty as a suspect in multiple burglaries in the area and suspected he might have secreted items he had stolen on the property. The property contained two residences: a mobile home on the north side of the road and a single-family residence on the south side of the road. At the time of the search, Mr. Varty appears to have been residing in (or at least "frequenting") the mobile home while Defendant was known to be residing in the single-family home. The problem presented is whether the affidavit supported a search of Defendant's residence. To address this issue, I find it helpful to catalog the nature of evidence Deputy Smith marshaled in support of his first warrant application:

1.  The affidavit is replete with information regarding Mr. Varty's involvement in burglaries in Jones County, Iowa from on or about December 16, 2020 to December 25, 2020. (Gov. Ex. 1 at 3-5). There seems to be no dispute that these burglaries created probable cause to search the trailer where law enforcement believed he resided. However, law enforcement had no knowledge that Defendant was in any way involved in these burglaries and extensive details relating to each of them do not need to be recited here.

2.  Mr. Varty was suspected of breaking into unoccupied buildings and construction trailers and stealing various items, mostly power tools, and related equipment. (*Id.*, at 3–5, 36, 44). The warrant application did not contain evidence supporting Defendant's involvement in these break-ins and/or thefts. Relevant to the issues at bar, the affidavit discloses law enforcement's suspicion that Defendant could be involved in possession of or "fencing" stolen property from the thefts.

3.  Witnesses and law enforcement reported seeing, variously, a "smaller SUV, possibly silver in color, comparable to a Ford Escape," "a Jeep Liberty (possibly green in color)," Mr. Varty's vehicle, and Mr. Varty in and around the locations of the burglaries. (*Id.*, at 3–4). Some of these sightings were in the dark early morning hours, which are the hours when law enforcement believes the burglaries/thefts also occurred. (*Id.*). Defendant was not alleged to have been seen in these vehicles or at these sites.

6

4.   Mr. Varty is the registered owner of a 2003 blue Jeep Liberty. (*Id.*, at 4).

5.   At 4:20 a.m. on December 26, 2020, Mr. Varty was involved in a traffic stop in the area where the burglaries occurred. (*Id.*, at 5). The officer conducting the stop noticed that Mr. Varty was dressed in all camouflage clothing and was "extremely nervous." (*Id.*). The officer observed a black duffle bag in the back of the Jeep that appeared full with the zipper partly opened. Inside the duffle, he saw what he believed was a DeWalt tool. (*Id.*). The officer also noticed three Dewalt products on the back driver's seat, including a DeWalt angle grinder with an attached grinding wheel. (*Id.*). Mr. Varty told the officer he was not gainfully employed, but that the tools belonged to "his boss," whose telephone number he did not know. (*Id.*).

6.   Deputy Smith was aware that battery-powered tools like the DeWalt tools possessed by Mr. Varty on December 26 are utilized as burglary tools and that grinders are commonly utilized to gain access to structures and vehicles to commit thefts within. (*Id.*). Deputy Smith also knew a grinder was used to access trailers during a construction site burglary on December 25. (*Id.*, at 4–5). Several tools were taken during this burglary. (*Id.*, at 44).

7.   In late December 2020, a confidential source ("CS") stated that Mr. Varty offered to sell him tools and indicated that the tools were stolen ("hot"). (*Id.*, at 5). The CS arranged a controlled purchase between Mr. Varty and Chief Deputy Eckhardt. Mr. Varty arrived in his Jeep. Chief Deputy Eckhardt asked where the "job" was, meaning where the theft had occurred, and Mr. Varty said it was "close to home" and the name of the person was "Industry Builder," indicating that was the name on the side of the trailers. (*Id.*). Chief Deputy Eckhardt purchased 17 tools from Mr. Varty for $150. (*Id.*; Smith Hr'g Test). The owner of Integrity Builders verified that several of the tools recovered in the undercover purchase were stolen from his company trailers during the December 25 construction site burglary. (*Id.*). Deputy Smith believed that Mr. Varty was still in possession of more tools from this burglary. (*Id.*)

7

8. On January 12, 2021, Chief Deputy Eckhardt received a photo from the CS depicting tools that Mr. Varty attempted to sell to the CS. (*Id.*, at 6). In the Facebook Messenger photo, the tools are "clearly laid out on a carpeted floor, believed to be a residence. There is also a stain on the floor which may be later identified executing [a] search warrant which would be relevant for criminal prosecution." (*Id.*). In the photo, the person displaying the goods (presumably Mr. Varty) is wearing brown suede shoes similar to moccasins that have "unique" stitching. (*Id.*)

9. The affidavit in support of the first search warrant also stated that the sheriff's office knew cutting tools had been used to gain access in some of the burglaries and that the Iowa crime lab can match tool marks from suspected burglary tools used to cut locks at a burglary site and listed various cutting tools, including grinders. (*Id.*, at 7).

10. Deputy Smith knew the following facts about the property and Defendant's and Mr. Varty's relationship to it:

> I aware [sic] the thefts and burglaries mentioned in this affidavit have all occurred within several miles of John Ralston's residence where we believe Varty and Ralston are residing. We are aware based on sources utilized in this affidavit Varty has been utilizing his vehicles to likely scope out other properties to perpetrate his crimes. It is also possible, given the fact that several of the known locations are uninhabited, Varty may have already utilized said vehicle to commit crimes at other locations unknown to Law Enforcement. We are aware, Varty has been observed in the area of other properties which have residents known to be involved in stolen property. I am aware that often, suspects in these types of crime, take stolen property to multiple locations to "fence" and help avoid detection by Law Enforcement. The "fence" may be utilized to conceal stolen property or the "fence" may purchase the stolen property for a reduced price. They may also trade for other stolen property/narcotics. Often burglars will utilize storage sheds or other private property to conceal the stolen property.

Over the course of this investigation, Varty's vehicle, described above has been observed on multiple occasions at John Ralston's property located at XXX1 Bear Creek Road. The vehicle has been primarily parked on the northside of the property nearest the mobile home on the property. In speaking with a local resident of the area, [A.F.], he advised he has personally observed Varty on or about John Ralston's property on multiple occasions in the last several weeks. Your affiant has personally observed Varty's vehicle at Ralston's. I have also noticed there has been smoke coming from the flue at the mobile home.

On the 5th of January, 2021, Chief Deputy Eckhardt received information from his confidential source, Varty was residing at John Ralston's property. . . .

On the 14th of January, 2021, Investigator Austin Sorgenfrey and I drove by John Ralston's property. We again observed Colton Varty's Jeep Liberty parked on the north side of the [sic] to the north of the mobile home. The mobile home had smoke coming from the wood burning furnace indicating likely someone is residing inside. I observed Colton Varty on the south side of the property (south side of Bear Creek Road)walking towards a vehicle parked near the front of the property. The vehicle appeared to be a lighter colored Chevy Equinox (we believe this is the same vehicle Varty was arrested in several weeks earlier. During his arrest, Varty possessed a sawed-off shotgun and suspected methamphetamine[)]. When we made a second pass on the roadway, this vehicle was no longer present. On this same day, we observed a blue side-by-side UTV which we believed is stolen from a burglary in Cedar County. This vehicle is discussed further in a search warrant application by Deputy Sorgenfrey.

In my 8 years working as a Deputy in Jones County, I am aware John Ralston resides at XXX1 Bear Creek Road. His mother used to live on the same property. We recently received information, she has been moved into a care facility.

9

Ralston also recently paroled from prison to this address in November of 2020. Ralston has multiple convictions for property crimes related to theft/burglary. Ralston also had multiple weapons violations. Both Ralston and Varty are known drug users. We have received information from residents there has been a lot of traffic from the property at all hours of the night. Last night, our Deputies were in the area of this property and observed a side-by-side with an attached light bar, driving on both sides of the property. Until recent [sic], this UTV was not observed on the property. We believe this UTV, after our investigation today, is that stolen from Cedar County. We know from our investigation, Colton Varty and John Ralston have no gainful employment.

In my training and experience, to include multiple investigations of this nature, I am aware these criminals will often commit burglaries/thefts centered around their place of residence. We suspect and have probable cause to believe, Varty has committed multiple crimes of [this] nature in proximity to Ralston's residence. We just received information of a recent burglary that was reported yesterday. This property is 2.55 miles (as a crow flies) from the Ralston residence. Various tools were stolen at this property. Ralston's residence is also situated on the edge of Jones and Jackson County. This is a very rural area. Ralston's property is ideal to reside and or utilize as a fence to conceal one's person as well as stolen property. Being on the fringes of two counties, this area does no [sic] get heavy patrol from L/E.5 It is also situated in a manner which does not allow for much physical surveillance. The property and associated curtilage has multiple outbuildings, vehicles, timber, and residences, all of which could be utilize [sic] to hide and prevent L/E from locating property to which the possession is illegal. I am aware in executing search warrants of this nature, we often locate stolen property concealed in multiple areas and buildings on a property. This again, might deter L/E from . . . locating all stolen or illegal property if they were to gain access to the property. I am aware burglars will generally conceal stolen tools inside of structures. One, this keeps their

10

valuable property out of the elements but can also conceal its location from aerial surveillance using a drone or plane.

. . .

I know by speaking to residents situated near the Ralston residence about increased traffic to and from the residence. This short-term frequent traffic is consistent with criminal activity. I know from my experience burglaries are commonly also involved in the distribution of illegal drugs. Stealing property is a means for easy money to purchase drugs or trade for drugs.

(Id. at 5–7.) Deputy Smith testified that it was his belief that Mr. Varty was "frequenting or living. . . on the north side" of the property and that he had no knowledge that Defendant and Mr. Varty were living together. (Smith Hr'g Test). The property is "just a little under 10 acres . . . pretty much split in half by Bear Creek Road. So there's roughly five acres on the north side of Bear Creek Road and five acres on the south side." (Id.).

Deputy Smith also testified that Defendant's property has been known to be a place to fence stolen property "over the years." (Id.). Deputy Smith's definition of a "fence" is "a place that property gets dropped off to further conceal, et cetera." (Id.). Deputy Smith also said that fences may sell or "hold onto property for an inordinate amount of time" because statutes of limitations can expire, people forget about things, or investigations move on. (Id.). Deputy Smith presented his warrant application to state Magistrate Kristin Denniger on January 14, 2021. In addition to the four corners of the warrant, the judge also relied on Deputy Smith's sworn testimony provided at the time he presented the warrant application. (Gov. Ex. 1, at 70). Under oath, Deputy Smith told Magistrate Denniger where the structures were located on the property. (Smith Hr'g Test., at 73–76). Based on the warrant application and the testimony, the judge granted the warrant. (Gov. Ex. 1, at 71–73). The warrant was executed on January 15, 2021. (Id., at 74–88).

The warrant authorized law enforcement to search Defendant's residence on the south side of the property, the trailer home on the north side of the property, outbuildings, Mr. Varty's 2003 Jeep Liberty, Defendant, and Mr. Varty. (Id., at 1). Items to be seized were

11

- "[I]tems commonly used or [used to] assist in thefts or distribution of stolen property," including cellular phones;
- Indicia of occupancy;
- Tools burglars could use to gain access to locked structures or storage containers;
- Known stolen property;
- Carpet to verify a stain pattern;
- Footware believed to have been worn during thefts;
- Brown suede shoes similar to moccasins; and
- Tire tracks/treads for comparison.

(Doc. 31, 2–11) (footnotes omitted).

The Court will add additional facts as needed in its analysis of the R&R.

## IV. ANALYSIS

In moving to suppress the evidence obtained as a result of these warrants, defendant argued that the first search warrant used to search defendant's residence was not supported by probable cause and that the *Leon* good faith exception did not apply. (Doc. 21-2, at 3–6). Consequently, defendant argued, the facts used in support of the second and third warrants were fruit of the poisonous tree and any evidence discovered as a result of those warrants must be suppressed. (*Id.*, at 6–7). Judge Roberts agreed, finding that (1) the first warrant obtained by law enforcement officers did not contain a substantial basis for concluding that probable cause existed to support the search of defendant's residence, (2) the *Leon* good faith exception could not save the warrant, and (3) absent the information improperly obtained as a result of the first warrant, the second and third warrants did not contain sufficient information to sustain probable cause. (Doc. 31, at 11–38). The government objects to each of these findings.

### A. Probable Cause and the First Search Warrant

To be constitutionally valid, "a search warrant must be supported by a showing of probable cause." *United States v. Summage*, 481 F.3d 1075, 1077 (8th Cir. 2007) (citing *United States v. Underwood*, 364 F.3d 956, 963 (8th Cir. 2002)). Probable cause exists

12

if, based on the totality of the circumstances, a showing can be made "sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002). Judges are entitled to "draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (citations omitted). "[T]he probable cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal citations and quotations omitted). "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *United States v. Winarseke*, 715 F.3d 1063, 1067 (8th Cir. 2013) (internal citation and quotations omitted). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1948) (internal citations and quotations omitted).

"A[n] [issuing] magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotations omitted). The standard of review applied by reviewing courts is therefore far less than *de novo*. A court "should uphold the decision to issue the warrant so long as it is supported by substantial evidence on the record." *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (internal quotations omitted). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (internal quotations omitted). Thus, a warrant must be upheld so long as the affidavit—considered in its

entirety—contains sufficient facts to establish a fair probability that contraband will be discovered in a particular place.

Here, the particular place searched was defendant's residence,[1] a one-story dwelling on approximately nine acres in rural Jones County. Defendant does not contest the existence of probable cause to search Colton Varty's residence on the northern side of the property. Nor does defendant contest the sufficiency of the warrant to search most other areas of the property. Defendant argues simply that the warrant does not establish a link between Varty and defendant sufficient to establish probable cause that evidence would be located inside defendant's residence. Defendant asserted that for law enforcement officers to search multiple buildings on the same property "there must be probable cause to search all of the buildings," and that law enforcement failed to establish "a nexus between the contraband and the place to be searched." (Doc. 29-2). Judge Roberts found that (1) the affidavit described the places to be searched in overbroad terms, (2) the information in the affidavit connecting Varty to the south side of the property in general was minimal, and (3) the affidavit contained no information connecting Varty to defendant's residence specifically. (Doc. 31, at 18–26). Accordingly, Judge Roberts found that the warrant did not establish a nexus between evidence of Varty's burglaries and defendant's residence on the south side of the property. (*Id.*).

---

[1] As Judge Roberts noted, the affidavit uses the terms "residence" and "property" seemingly interchangeably. (Doc. 31, at 20–21). This conflation of terms makes it difficult for the Court to know precisely which facts or observations are attributable specifically to defendant's residence and which are attributable to the larger property more generally. The Court finds that the affidavit's imprecise references to defendant's residence and the property on which it sat, however, was a product of poor draftsmanship and was unintentional. For purposes of this order, the Court uses "residence" to refer to the physical structure where defendant lived and "property" to describe the several acres upon which defendant's residence was situated. *See Farlee*, 757 F.3d at 819.

The government objects to Judge Roberts' conclusion, arguing that "there is ample evidence in the four corners of the first search warrant" to support a finding of probable cause. (Doc. 35-1, at 8). Specifically, the government argues that the affidavit contained (1) "links between Varty and defendant and explanations of why evidence of thefts could be found anywhere on the property, including in defendant's personal residence," (2) testimony from Sergeant Investigator Smith describing why he believed defendant's property and residence were ideal for concealing stolen property, and (3) facts about defendant's past and criminal history which support probable cause. (*Id.*, at 8–10).[2]

### 1.    *Evidence Establishing a Connection Between Varty and Defendant*

The government points to several portions of the affidavit in an effort to establish a connection between the two men. Specifically, the government cites the fact the "defendant's personal residence and Varty's mobile home were on opposite ends of the same property" and the fact that Sergeant Investigator Smith once observed Varty walking towards Varty's vehicle on the south side of the property, "near defendant's personal residence." (*Id.*, at 8–9). The government also cites the observation by law enforcement officers of a UTV "on both sides of the property" which they believed to be stolen. (*Id.*, at 9).

These facts help establish Varty's connection to the property and contribute to a finding of probable cause that evidence of the burglaries may be found in places other

---

[2] The government obliquely references Sergeant Investigator Smith's possession of "additional information about defendant[ ] and his personal residence's ties to criminal activity" that was not included in the application for the search warrant or attached affidavit. (Doc. 35-1, at 5). Sergeant Investigator Smith also testified at the suppression hearing that the sworn oral testimony he provided to the issuing judge along with his affidavit related solely to the layout of the property and not defendant's criminal history or suspicions of ongoing criminal activity. (Doc. 34, at 4–5). Because it was not contained within the four corners of the application, the Court does not consider that information in its analysis of whether the application as presented to the issuing judge contained sufficient information to establish probable cause.

than Varty's mobile home, but they lend very little weight in establishing a connection between Varty and defendant personally or defendant's residence specifically. Neither the law enforcement officers nor any of the several confidential sources used throughout the investigation observed Varty and defendant together. Sergeant Investigator Smith was apparently quite familiar with defendant and had known of defendant for several years, yet he was in possession of no facts establishing a direct relationship between the two men. Neighbors observed traffic coming to and from the house at all hours, but none of them ever observed defendant and Varty together. Indeed, despite the plethora of seemingly well-sourced and reliable information about Varty and his criminal activity, none of it implicated defendant or suggested that defendant and Varty even knew one another.

The only facts connecting defendant and Varty by anything other than inference are based entirely on their physical proximity to one another. In *United States v. Everroad*, 704 F.2d 403 (8th Cir. 1983), law enforcement officers observed the defendant in the company of a man they suspected to be distributing controlled substances. *Id.* at 404. The officers observed the two men ride in a vehicle together, stop at the defendant's motel room for approximately fifteen minutes, and then part company. *Id.* After arresting the other man in the course of a drug transaction at a nearby restaurant, law enforcement officers proceeded back to the defendant's motel room and arrested him there. *Id.* at 405. In finding that the government lacked probable cause to arrest the defendant, the Eighth Circuit Court of Appeals found, among other things, that "the location of [the defendant's] motel near the scene" of his associate's arrest was "unavailing." *Id.* at 406. Concluding that "physical proximity to a crime combined simply with a brief association with a suspected criminal—when there is no other unlawful or suspicious conduct by any party involved—cannot support a finding of probable cause," the court emphasized the fact that "law enforcement would not have been

hampered . . . if the agents had waited to obtain more facts before seeking to arrest [the defendant]." *Id.* at 407.

This holding may be helpfully contrasted with the Eighth Circuit's holding in *United States v. Travis*, 993 F.3d 1316 (8th Cir. 1993). There, law enforcement officers arrested the defendant on suspicion of drug distribution as she returned to her house. *Id.* at 1323. The defendant argued that the police had no reason to suspect her of illegal activity other than her association with known criminals. *Id.* at 1324. The Eighth Circuit found that law enforcement officers knew from a reliable informant that a woman matching the defendant's description was selling cocaine, that the defendant was using aliases, and that she resided in a house where large-scale drug distribution was taking place. *Id.* The Eighth Circuit found those facts sufficient to establish probable cause to arrest the defendant. *Id.*

To be sure, the government relies on more than just proximity for the overall finding of probable cause. In the totality of the circumstances, however, the Court affords little weight to the facts in the affidavit purported to establish a relationship between Varty and defendant.

### 2. *Suitability of Defendant's Property for Criminal Activity*

The government also cites information in the affidavit consisting of Sergeant Investigator Smith's assessment of the property and its suitability for criminal activity. Specifically, Sergeant Investigator Smith opined that he was "aware the thefts and burglaries mentioned in this affidavit have all occurred within several miles of [defendant's] residence where we believe Varty and [defendant] are residing." (Doc. 21-3, at 5). Sergeant Investigator Smith explained his assessment further:

> In my training and experience, to include multiple investigations of this nature, I am aware these criminals will often commit burglaries/thefts centered around their place of residence. We suspect and have probable

cause to believe, Varty has committed multiple crimes of nature [sic] in proximity to [defendant's] residence. We just received information of a recent burglary that was reported yesterday. This property was 2.55 miles (as the crow flies) from the [defendant's] residence. Various tools were stolen at this property. [Defendant's] residence is also situated at the edge of Jones and Jackson County. This is a very rural area. [Defendant's] property is ideal to . . . utilize as a fence to conceal one's person as well as stolen property. Being on the fringes of two counties, this area does not get heavy patrol from L/E. It is also situated in a manner which does not allow for much physical surveillance. The property and associated curtilage has multiple outbuildings. Vehicle, timber, and residences, all of which could be utilize[d] to hide and prevent L/E from locating property to which the possession is illegal. I am aware in executing search warrants of this nature, we often locate stolen property concealed in multiple areas and buildings on the property.

(*Id.*, at 6–7).

These observations about defendant's property offer little support for a finding of probable cause. There are likely a great many properties that are close to a county line, rural, and punctuated by timber and outbuildings. Likewise, that defendant's property was within 2.55 miles of a reported burglary can be said of a number of other properties. None of these properties fall within the scope of Sergeant Investigator Smith's investigation, however. The critical distinction between all other properties to which the above-quoted description might apply and defendant's property is that Varty resides on defendant's property. In that way, this description strikes the Court as an attempt to justify casting as wide a net as possible. Based on the description and opinion provided above, law enforcement officers would have been just as entitled to search the home of defendant's neighbors as well. Indeed, the affidavit contains just as much information connecting Varty to the neighbors' residences as it did to defendant's residence.

The ambiguity of the warrant in this respect troubles the Court. Judge Roberts observed, as the Court noted above, that the affidavit vacillates freely between

defendant's property in general and defendant's residence specifically. The affidavit also blurs the distinction between Varty's residence and defendant's residence and property. In doing so, the affidavit superficially appears to connect the two men when in fact it does nothing of the sort. For example, the passage "these criminals will often commit burglaries/thefts centered around their place of residence. We suspect and have probable cause to believe, Varty has committed multiple crimes of nature [sic] in proximity to [defendant's] residence" is especially problematic. The preceding five pages of the affidavit describe in great detail the mountains of evidence uncovered incriminating Varty and Varty alone. If "these criminals"—meaning burglars in general—do in fact commit their crimes around their residences as the affidavit asserts, the residence that Varty's burglaries implicate is Varty's, not defendant's. By making the claim that burglars commit crimes around their residences and then asserting that Varty has committed multiple burglaries around defendant's residence, the affidavit effectively steals a base— evidentiarily speaking—and reorients the weight of the evidence towards a person not otherwise implicated at all.

The Court recognizes that law enforcement officers are entitled to make inferences and judgments based on their unique training and experience. In considering probable cause determinations, the Court affords law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). "[S]uch latitude is not without limits," however. *Id.* It is possible that by "[defendant's] residence" here, the affidavit truly meant the property in general, but that ambiguity significantly alters the tenor of the evidence. The logical jump between Varty's well-documented burglaries and defendant's previously unmentioned residence, however, is too tenuous to support a finding of probable cause to search defendant's residence specifically.

Case 1:21-cr-00076-CJW-MAR    Document 36    Filed 05/02/22    Page 19 of 28

### 3.    *Defendant's Known History*

The government also argues that Judge Roberts gave insufficient weight to defendant's past, including his prior criminal convictions and Sergeant Investigator Smith's personal knowledge of defendant. (Doc. 35-1, at 9–12). Specifically, the government points to defendant's past convictions for burglary and theft. (*Id.*, at 10). The affidavit also includes information related to defendant's past weapons violations. (Doc. 21-3, at 6). The government also notes the extent of Sergeant Investigator Smith's personal knowledge of defendant's history, including that defendant was recently paroled from prison, that defendant and Varty "are known drug users," and that neither man is gainfully employed. (*Id.*).

A suspect's relevant criminal history can inform the existence of probable cause. *See United States v. Thurmond*, 782 F.3d 1042 (8th Cir. 2015). In *Thurmond*, law enforcement officers executed a search warrant of defendant's home on suspicion of drug distribution. The affidavit supporting the warrant established that the defendant had two prior convictions for possession of controlled substances—one merely six months prior— and a conviction for assault. *Id.*, at 1044. The affidavit also established that law enforcement officers discovered evidence of drug use in defendant's trash. *Id.* at 1043. In finding that the affidavit contained sufficient information to establish probable cause to search the defendant's residence, the Eighth Circuit focused solely on defendant's prior drug conviction and the evidence discovered in the defendant's trash. *Id.* at 1045. The court made no mention of defendant's prior assault conviction. The court therefore viewed the defendant's criminal history as relevant only as it related to the other evidence and to the suspected evidence of criminal activity the warrant was intended to uncover.

Here, defendant's two prior thefts and lone burglary conviction support an inference that defendant may be involved in property crimes. Nevertheless, it does not support a finding of probable cause to believe that he was involved in property crimes on

this occasion or that evidence of property crimes would be found in defendant's residence. Further, the government failed to establish a sufficient connection between defendant's history of drug use and the other evidence or the purpose of the search warrant. First, Sergeant Investigator Smith's assertion the defendant and Varty are "known drug users" is of little value when the affidavit does not include any information as to how that information is known. Such conclusory statements have little value in a probable cause analysis. *See United States v. Farlee*, 910 F.Supp.2d 1174, 1183 (D. S.D. 2012) (concluding the conclusory statements fail to meet the probable cause standard).

Second, although the affidavit meanders into defendant's past weapons violations, drug use, and drug convictions, that information has no bearing on the existence of evidence of burglaries particularly described in the warrant. Sergeant Investigator Smith attempted to link Varty's burglaries to broader drug use and transactions by opining that "burglaries [sic] are commonly also associated in the distribution of illegal drugs. Stealing property is a means for easy money to purchase drugs or trade for drugs." (Doc. 23-1, at 7). The only fact in the affidavit suggesting that this opinion applied to the burglaries in Varty's case, however, was the neighbors' observation of short-term traffic to and from defendant's residence. (*Id.*). Again, the affidavit's tendency to use "residence" and "property" interchangeably render it impossible to know whether the neighbors observed this short-term traffic at defendant's residence, at Varty's trailer on the property, or on the property in general.

Third, the warrant is directed at evidence of burglaries, not drug crimes. The bulk of the affidavit is devoted to the burglaries perpetrated by Varty. The investigation into Varty's activities focused solely on the reported burglaries and the presence of stolen property on defendant's property. Although the affidavit establishes that law enforcement discovered methamphetamine in Varty's vehicle, the affidavit did not describe whether law enforcement followed up on this incident, how it related to Varty's burglaries, or

how the warrant was intended to uncover evidence related to controlled substances. Indeed, the warrant application and the warrant itself reflect that law enforcement officers particularly sought

1. Any and all devices, documents, ledgers, money, orders, money drafts, stubs, records, receipts, police scanners, security cameras, cellular phones and all other items commonly used or assist [sic] in thefts or distribution of stolen property.
2. Indicia of occupancy to include but not limited to identification cards, mail, checks, banks record, receipts
3. Tools that could be utilized by burglars to gain access to locked structures, or storage containers such as grinders, bolt cutters, reciprocating tools, screw drivers.
4. Any property known to be reported stolen that can be verified by identification number/s, or visual identification, markings consistent with victim description of said items.
5. Carpet inside structure to verify potential pattern and stain
6. All footwear believed to be worn at burglaries/thefts
7. One pair of brown swede [sic] shoes similar to a moccasin
8. Tire tread/tire tracks for comparison

(Doc. 21-3, at 2, 72). Thus, despite apparent concern for drug distribution, law enforcement officers were not actually seeking evidence of drug distribution, at least not initially. This explains the necessity of a subsequent warrant to seize drug evidence observed in defendant's residence. It also indicates that the generalized references to defendant's drug history or drug use in the initial affidavit were efforts to connect defendant to Varty through a common history of drug use rather than facts supporting the existence of probable cause to believe that evidence of burglaries would be found within defendant's residence. The Court thus finds that defendant's past convictions for burglary and theft support an inference that he could have been involved in property crimes, but did not support a finding of probable cause that evidence of property crimes would be found in his residence. The Court also finds that defendant's prior use of drugs and drug-

related convictions are simply not germane to the inquiry. Similarly, references to defendant's weapons violations do not support a finding of probable cause.

### 4. *Totality of the Circumstances*

After considering all the information included in the affidavit, the Court finds the following facts plausibly support a finding of probable cause: (1) the fact that Varty resided on the same property as defendant, (2) the presence of the suspected stolen UTV on the property, (3) Sergeant Investigator Smith's opinion on the suitability of defendant's residence for criminal activity, and (4) defendant's past burglary and theft convictions. However, considering the totality of the circumstances, these facts do not constitute substantial evidence supporting probable cause to search defendant's residence.

The Court finds *Everroad* instructive in its assessment of the degree of information required to establish probable cause. Although *Everroad* does not definitively establish the floor of what degree of information must be articulated to establish probable cause, it does represent a standard below which law enforcement may not go if they wish to show probable cause.

In *Everroad*, the government could establish that the defendant and the suspect knew each other. Law enforcement officers observed them in close contact. 704 F.2d at 404. The suspect drove the defendant to his motel room and parked next to a second vehicle, a blue Datsun, that law enforcement had previously observed at a house associated with their suspect. *Id.* The defendant and the suspect lingered at the hotel for some time while the defendant went in and out of the room and eventually the two went into the room together. *Id.* Later, after arresting the suspect, law enforcement officers learned from the motel clerk that the blue Datsun at the motel belonged to the defendant. Thus, law enforcement could establish some degree of connection between their suspect, the defendant, and the motel. Most importantly, they could establish a relationship between the defendant and their investigation.

23

Here, such a relationship is only inferred. Both the property and defendant's residence are owned by defendant's mother. The affidavit does not reflect the circumstances by which Varty came to reside on the northern portion of the property, whether it was with defendant's permission or under an agreement with defendant's mother. As far as the information in the affidavit is concerned, the relationship may very well be akin to that of two men who live in the same apartment complex owned by a common landlord. Law enforcement officers are not required to rule out every possible innocuous explanation for particular facts in order to justify a search, but there must be some showing of probability that the facts asserted indicate criminal activity. The affidavit does not describe any personal interactions between defendant and Varty; merely that they live on the same property and that Varty was once seen in relative proximity to defendant's residence. Despite extensive direct evidence from law enforcement officers and confidential informants connecting Varty to the possession and sale of stolen property, the affidavit includes no facts linking defendant personally to stolen property— or any other criminal activity, for that matter. The only fact establishing a connection between defendant's residence and Varty's well-documented thefts was the observation of the UTV parked in close proximity to defendant's residence. This lone detail— substantially less than what the Eighth Circuit deemed to be insufficient in *Everroad*—is not enough to lift the otherwise incidental details and supposition connecting defendant's residence to criminal activity above the threshold required to establish probable cause.

The government objection on this ground is **overruled**.

### B.    *Leon Good Faith Exception*

"Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). A "good-faith inquiry is confined to the

24

objectively ascertainable question whether a reasonably well[-]trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (internal quotations and citations omitted) (alteration in original). There are four circumstances in which an officer's reliance on a warrant may be said to be objectively unreasonable: (1) when the affidavit supporting the warrant contained a false statement included knowingly and intentionally or with reckless disregard for the truth, thus misleading the magistrate, (2) when the magistrate issuing the warrant "wholly abandoned his judicial role" in issuing the warrant, (3) "when it is entirely unreasonable to believe that an affidavit provides probable cause to issue a warrant," and (4) when the warrant is "so facially deficient" that no police officer could reasonably interpret the warrant as valid. *See Puckett*, 466 F.3d at 630.

Finding that the third circumstance applies in the instant case, Judge Roberts found that the *Leon* good faith exception did not spare the warrant. (Doc. 31, at 29). The government objects, arguing that the reliance of the executing officers on the probable cause assessment of the issuing judge was objectively reasonable and that the officers' belief in the existence of probable cause was not entirely unreasonable. (Doc. 35-1, at 13–16). On this point, the Court respectfully disagrees with the R&R, although it is a close question.

Although the Court found that the affidavit supporting the warrant failed to establish probable cause, it did contain sufficient information plausibly supporting probable cause to render an officer's belief in the existence of probable cause not entirely unreasonable. First, a reasonable officer could credit the probable cause assessment of the issuing judge. *Leon*, 468 U.S. at 920–21. "In the ordinary case, an officer cannot be expected to question the [issuing judge's] probable cause determination. *Id.* at 921. Second, the affidavit was not entirely devoid of seemingly incriminating facts. For

25

example, the Court set aside information about defendant's prior and allegedly extant drug use and information about his past weapons violations and granted little weight to the fact that Varty resided on the same property as defendant. A reasonable officer cannot be expected to make such distinctions regarding details that are at least facially relevant. Further, the presence of the suspected stolen UTV near defendant's residence and his criminal history involving property crimes were salient details that would support a reasonable officer's belief in the existence of probable cause and good faith reliance on the warrant. *See Proell*, 485 F.3d 427, at 431 Defendant's otherwise close proximity to Varty for whom there was significant evidence of his involvement in burglaries and possession of stolen property, while far from sufficient by itself to establish probable cause, adds to the patina of probable cause in the context of the other evidence.

The purpose of the exclusionary rule is to deter unlawful police conduct. *See United States v. Peltier*, 422 U.S. 531, 539 (1975). In the instant case, "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way. . .. Excluding the evidence can in no way affect [officers'] future conduct unless it is to make him less willing to do his duty." *Stone v. Powell*, 428 U.S. 465, 539–540 (1976) (White, J., dissenting). Although the Court finds the first warrant failed to establish probable cause to search defendant's residence as a legal matter, it was not so deficient that the officers executing the search were entirely unreasonable in their belief that it did establish probable cause. Thus, the government's objection on this ground is **sustained**.

### C. *Probable Cause Established by Subsequent Search Warrants*

In his initial motion to suppress, defendant argued that the second and third search warrants fail to establish probable cause to search defendant's residence when stripped of the information unlawfully obtained during the execution of the first warrant. (Doc. 21, at 6–7). Having concluded that the first warrant did not support a search of defendant's residence and that the *Leon* good faith exception did not apply, Judge Roberts analyzed

26

the substance of the subsequent warrants. (Doc. 31, at 32–39). After meticulously excising what he had determined to be improperly obtained information from the second and third warrants, Judge Roberts determined that neither warrant contained sufficient information to establish probable cause to search defendant's residence. (*Id.*). The government concedes that the second and third warrants "would not have occurred without the first warrant and there was not an independent basis for them." (Doc. 35-1, at 16). The government objects on this ground as an extension of its primary objection to the suppression of the first warrant, however, asserting that "there was no poisonous tree" and thus no justification to discard the second and third warrants. (*Id.*).

The second warrant authorizes a search of defendant's residence, a black Chevrolet truck, and a Carrilite fifth wheel camper. (Doc. 21-3, at 103). This warrant specifically seeks drugs and related paraphernalia as well as weapons and ammunition. (*Id.*, at 104). The affidavit attached in support of this warrant describes the search executed under the first warrant and specifically describes the personal observations of the affiant—again, Sergeant Investigator Smith. The affidavit identified the presence of two firearms, a handgun holster, and assorted ammunition within the residence. (*Id.*, at 91). Also within the residence, law enforcement officers observed paraphernalia related to suspected methamphetamine use, drug packaging materials, and a digital scale. (*Id.*). The search also discovered several items of suspected stolen property sought under the first warrant and evidence of recent occupation of the camper. (*Id.*). The third warrant authorizes collection of defendant's urine and blood. (*Id.*, at 135). The affidavit supporting this warrant contains information detailing the drugs and paraphernalia discovered in defendant's residence as well as his history of drug use and distribution. (*Id.*, at 121–31).

The Court agrees with Judge Roberts that the second and third warrants could not stand on their own without the information obtained under the first warrant. Defendant's

27

criminal history paired with Sergeant Investigator Smith's bare assertion that defendant "has been involved in the use and sale of illegal drugs" is insufficient to support a finding of probable cause in either warrant. Given the Court's conclusion that the fruits of the first warrant were spared by the *Leon* good faith exception, however, the warrants are supported by direct evidence of drug use and firearms possession by a prohibited person. Accordingly, suppression of evidence obtained under the second and third warrants is inappropriate. The government's objection on this ground is **sustained**.

### V.     *CONCLUSION*

For the reasons stated above, the government's objections (Doc. 35) to the R&R are **overruled in part and sustained in part**. The Court **adopts in part and rejects in part** Judge Roberts' Report and Recommendation (Doc. 31) and **denies** defendant's Motions to Suppress (Docs. 21, 28).

**IT IS SO ORDERED** this 2nd day of May, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

28
